UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUSTEES OF THE OPERATING ENGINEERS PENSION TRUST, TRUSTEES OF THE OPERATING ENGINEERS HEALTH AND WELFARE FUND, TRUSTEES OF THE OPERATING ENGINEERS VACATION-HOLIDAY SAVINGS TRUST, AND TRUSTEES OF THE OPERATING ENGINEERS TRAINING TRUST,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>NANCIE'S SWEEPING, INC., a corporation<br><br>　　　　　Defendants. | CV 08-5287 SVW (FFMx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**I.   Introduction**

　　Plaintiffs Trustees of the Operating Engineers Pension Trust, Trustees of the Operating Engineers Health and Welfare Fund, Trustees of the Operating Engineers Vacation-Holiday Savings Trust and Trustees of the Operating Engineers Training Trust ("Trusts Funds") allege that

Defendant Nancie's Sweeping ("Nancie's Sweeping") breached the Master Labor Agreement between Southern California Contractors Association and the International Union of Operating Engineers Local Union No. 12 by failing to pay fringe benefit contributions.  The Trust Funds seek damages in the amount of the unpaid fringe benefit contributions, liquidated damages of ten percent of the amount of unpaid fringe benefit contributions, prejudgment interest calculated pursuant to 26 U.S.C. § 6621, audit costs, and attorney's fees.

Having conducted a bench trial on July 8, 2009, the Court now makes the following findings of facts and conclusion of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**II.  Facts**

Nancie's Sweeping is an industrial street sweeping company.  Third party contractors contract with Nancie's Sweeping to supply sweeping services on projects such as street construction or street paving.  On each project, Nancie's Sweeping assigns a driver and a specific street cleaning vehicle.  After performing the sweeping services, the driver submits a "ticket" to the client.  The ticket contains information including the driver's name, the vehicle used, the client's name, and the client's signature.  The ticket serves to certify that work was performed by a Nancie's Sweeping employee on that day for the specified amount of hours.  When Nancie's Sweeping eventually sends an invoice for the work done, the ticket is attached to the invoice as proof.

Nancie's Sweeping is bound to the Master Labor Agreement between the Southern California Contractors association and the International

Union of Operating Engineers Local 12.  Pursuant to the Master Labor Agreement and ERISA, 29 U.S.C. 1145, Nancie's Sweeping is required to make fringe benefit contributions to the Trust Funds for work that is covered by the Agreement.  Street sweeping services are covered work under the Agreement.  Accordingly, Nancie's Sweeping must pay fringe benefit contributions for each hour an employee of Nancie's Sweeping performs street sweeping services.  Nancie's Sweeping reports the amount of covered work her employees perform by submitting monthly reports to the Trust Funds.  The reports list the employees who worked that month as well as the hours each employee worked.  Nancie's Sweeping then pays the corresponding amount to the Trust Funds.  The current matter concerns the Trust Funds' allegation that Nancie's Sweeping underreported, and thereby, underpaid its trust contributions.

In 2008, the Trust Funds began an audit of Nancie's Sweeping.  Auditor Michael Babel met with Nancie Reyes, owner and operator of Nancie's Sweeping, and requested all payroll and related records showing all the hours worked by or paid to Nancie's Sweeping employees who performed work within Local 12's jurisdiction.  According to Babel, Reyes gave Babel a few copies of invoices, none of which contained numeric invoices.  In response, Babel asked Reyes for copies of numeric invoices, including the supporting tickets.  Babel testified that Reyes indicated that she did not maintain numeric invoices and that she did not have copies of invoices she submitted to third parties or the corresponding tickets.  (See Babel Decl. ¶ 6.)

Unsatisfied with Nancie's Sweeping's recordkeeping, the Trust Funds filed the current action, and subpoenaed invoices from Nancie's Sweeping's third party clients.  Babel performed an audit comparing the

3

hours Nancie's Sweeping reported to the Trust Funds with the hours billed on the invoices to the third parties. From the audit, Babel concluded that Nancie's Sweeping had underreported hours in two categories.

First, Babel compared the hours billed to the third parties with the hours reported to the Trust Funds. Babel found that according to the third party invoices, Nancie's Sweeping's employees had billed 18,958.50 more hours to third parties than were reported to the Trust Funds on the monthly report forms. (See Ex. 16.) Babel calculated that due to the underreporting of hours, Nancie's Sweeping owes the Trust Funds $283,681.95 in unpaid fringe benefit contributions. At trial, Nancie's Sweeping pointed to various months that were not accurately reported in Babel's report. (See Ex. 57.) Babel conceded that those months should be updated to reflect the correct amount of hours reported.

Babel also concluded that there was a second category of unreported hours. In performing the audit, Babel noted that all of Nancie's Sweeping's invoices were numbered. Babel noted that there appeared to be seven different numerical sequences of invoices: (1) from 2218 through 3,000, (2) from 3,000 through 5,999, (3) from 6,000 through 6,679, (4) from 1 through 275, (5) from 6587 through 7202, (6) from 275 through 334, and (7) from 7203 through 8208. Within the sequences, Babel found that there were numbers for which Babel could find no corresponding invoice. The Trust Funds argue that every number that does not have a corresponding "known" invoice, must actually be a "missing" invoice that Nancie's Sweeping billed to an unknown client. As such, the Trust Funds argue that in total Nancie's Sweeping sent out

4

3,415 invoices, only 2,329 of which the Trust Funds were able to locate through the third party clients. Thus, the Trust Funds argue that 1,086 invoices are "missing." The Trust Funds argue that they are due fringe benefit contributions for these "missing" invoices.

**III. Analysis**

    **1. Underreported Hours Supported by Third Party Invoices**

    For the first category, the Court finds that the Trust Funds proved that Nancie's Sweeping breached the Master Labor Agreement by underreporting hours to the Trust Funds. The Trust Funds offered evidence that Nancie's Sweeping billed third party clients for 18,958.50 more hours than were reported to the Trust Funds. (See Ex. 16.)

    In response, Reyes, the proprietor of Nancie's Sweeping, testified that the hours reported to the Trust Funds were accurate. Reyes testified that the hours reported to the Trust Funds were less than the hours billed on the invoices because in some instances the invoices reflected work done by subcontractors, and in other instances her employees waived their fringe benefit contributions in order to be paid in cash. First, Nancie's Sweeping presented no evidence besides Reyes's testimony that the underreported hours reflected the work of subcontractors. The court did not find Reyes's testimony credible. Reyes claimed that some of the employees on the client invoices were employees of her ex-husband's company or her brother's company, however, neither the ex-husband or the brother testified regarding a

5

subcontracting relationship.  Further, Babel testified that whenever he saw documentation that reflected subcontracting he did not count those hours that towards Nancie's Sweeping's underreporting.

Second, the Court finds Nancie's Sweeping did not present sufficient evidence that Nancie's Sweeping employees waived their fringe benefit contributions in order to be paid in cash.  Reyes testified that on some occasions her employees would waive their benefit contributions to receive payment in cash, and that those hours were not reported to the Trust Funds.  Again, Nancie's Sweeping provided no evidence other than Reyes's testimony regarding the waiver. The Court did not find Reyes's testimony regarding the cash payments to employees credible.

As such, the Court finds Nancie's Sweeping liable for the underreported hours as supported by exhibit 16 minus the corrections Babel conceded at trial.

**2. Underreported Hours due to "Missing" Invoices**

**1. Burden Shifting for Inadequate Records**

The Ninth Circuit has adopted a burden-shifting framework to determine the amount of damages when a trust fund alleges an employer owes benefit contributions, but the trust cannot prove the exact amount owed because the employer has failed to maintain adequate records. Under ERISA, "every employer shall . . . maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."  29 U.S.C. § 1059(a)(1).

6

Thus, the Ninth Circuit has held that "once the Trustees show (1) that [the employer] failed to keep adequate records, and (2) that there exist some employees who (a) performed covered work that was (b) unreported to the trust funds, then the burden shifts to the employer to show the extent of the unreported covered work for those employees." Motion Picture Industry Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, 1066 (9th Cir. 2001).

This burden shifting framework is appropriated from the Fair Labor Standards Act framework set forth by the Supreme Court in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946). In Anderson, the Supreme Court held that an employee carries his burden of the showing the amount of damages "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. at 687. The Supreme Court explained that:

> The employer cannot be heard to complain that the damages lack exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA] . . . . Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case "it would be

>a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." It is enough under these circumstances that there is a basis for a reasonable inference as to the extent of the damages.

Id. at 688 (citations omitted) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)).

The Ninth Circuit first applied the Anderson framework to ERISA cases in Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 133 (1988). The Ninth Circuit held that the Anderson "reasoning applies with equal force to cases arising under ERISA. The records that employers are required to keep by FLSA and by ERISA may be the only evidence available to employees to prove that their employers have failed to compensate them in accordance with the statute. An employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required." Brick Mason, 839 F.2d at 1338.

In Motion Picture, the Ninth Circuit made clear that in order for the burden to shift, the trust funds must prove the fact of damage. The Ninth Circuit held:

>That is, "once the Trust Funds proved the fact of damage" and the employer's "failure to keep adequate records," the burden shifted to the employer to come forward with evidence of the "extent of the [damage]." [Brick Masons, 839 F.2d] at 1338-39. The "fact of damage [was] certain" in Brick Masons because "[i]t was undisputed that the Trust Funds received *no* contributions for work performed

8

1        by [35 masons] even though they did *some* covered work during the
2        relevant time period." <u>Id.</u> at 1338 (emphasis added).  The only
3        uncertainty was "in the amount of damages arising from the
4        statutory violation by the employer." <u>Id.</u> at 1338 (quoting
5        <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 688 (1946).  It
6        was on this question that "the burden shifted to [the employer] to
7        come forward with evidence of the extend [sic] of the covered work
8        performed . . . ." <u>Id.</u> at 1338-39.
9 259 F.3d at 1065.

10     In <u>Motion Picture</u>, N.T. Audio employed eighteen local union
11 members, and was also a party to collective bargaining agreements with
12 two unions.  Pursuant to the collective bargaining agreements, N.T.
13 Audio was obligated to make contributions on behalf of its employees
14 who were performing work covered under those agreements to two pension
15 and employee benefit plans. <u>Id.</u> at 1064.  The Plans initiated an audit
16 of N.T. Audio's records, covering 4 years, and concluded that N.T.
17 Audio owed the Plans approximately $32,000. <u>Id.</u>

18     The Ninth Circuit reversed the district court's grant of summary
19 judgment on the grounds that the plans had not presented any evidence
20 of covered work that was done that was not accounted for.  The Ninth
21 Circuit recognized that "there [was] little doubt that the Trustees met
22 their first threshold burden, proving that N.T. Audio failed to keep
23 adequate records." <u>Id.</u> at 1066.  However, the Ninth Circuit held that
24 "[t]he Trustees did not . . . produce evidence meeting their other
25 threshold burdens, proving that there existed some employees who (a)
26 performed covered work that was (b) unreported to the Plans." <u>Id.</u> at
27 1066-67.  The Ninth Circuit held that "[a]lthough the Trustees produced
28

evidence to establish that N.T. Audio failed to report some of the hours worked by its employees, it did not produce evidence establishing that those unreported hours corresponded to *covered* work." Id. at 1067.

Here, the Trust Funds have provided adequate evidence that Nancie's Sweeping did not maintain adequate records. Babel testified that Reyes did not keep copies of any of the invoices she submitted to contractors for payment, and further, the third party invoices did not match the hours reported to the Trust Funds. Thus, the Court will turn to whether the Trust Funds provided sufficient evidence of covered work that was unreported to shift the burden to Nancie's Sweeping.

### 2. Underreported Hours due to "Missing" Invoices

The Trust Funds argue that they are owed fringe benefit contributions for work Nancie's Sweeping billed through the "missing" invoices. The Trust Funds argue that under Brick Mason and Motion Picture, they are entitled to make a reasonable estimation of the damages because Nancie's Sweeping did not keep adequate records. The Trust Funds argue that a reasonable estimation of the amount of hours underreported due to the "missing" invoices is the amount of missing invoices, 1,086, multiplied by the average amount of underreported hours on the "known" invoices, 17 hours. Although this calculation comes to a total of 18,462 hours, the Trust Funds only estimate that Nancie's Sweeping underreported 18,422 hours. (See Pl.'s Ex. 18.) Based on this estimate, Nancie's Sweeping would owe an additional $279,177.86 to the Trust Funds.

Under Motion Picture, the burden only shifts to the defendant if the plaintiff has proven inadequate record keeping *and* the fact of damage. 259 F.3d at 1065. Here, the Court finds that the Trust Funds have proven inadequate record keeping, however, the Court finds that the Trust Funds have not proven the fact of damage. The Trust Funds presented no evidence that these "missing" invoices actually exist. The Trust Funds' entire basis for the "missing" categories is solely that Nancie's Sweeping's invoices have numbers on them. From there, the Trust Funds just assume that any number without a "known" corresponding invoice represents an actual "missing" invoice that was billed to an unknown contractor for work that would be covered by the Master Labor Agreement. The Court finds these assumptions unreasonable. Although the inference that Nancie's Sweeping underreported on some invoices may lead to a reasonable inference that it underreported on other invoices, it does not lead to the reasonable inference that there *were* other invoices.

Further, even if the Court assumes that these invoices exist, there is no evidence that the invoices reflect work within Local 12's jurisdiction. The instant case is similar to that in Chicago Steel & Crane, Inc. v. Structural Ironworkers Local No. 1 Welfare Fund, 2002 WL 1610980 (N.D. Ill. July 22, 2002). There, Chicago Steel sought a declaration that Chicago Steel did not owe contributions for amounts paid to its owner and corporate officer, Thomas Mooncotch or to "cash." Id. at *1. The auditors presented a report which

> indicated that there were two categories of possible additional
> reportable hours for which contributions and dues were owed: (1)
> 489.25 under-reported hours of 17 named iron workers, based on a

11

      review of Chicago Steel's payroll journals; and (2) 12,791.5
      unreported hours of unnamed iron workers based on . . . checks
      written to "cash" and to "Mooncotch," most of which Mooncotch had
      claimed on his personal income taxes, but for which there was no
      back-up documentation and which the auditors were unable to match
      with deposits in Mooncotch's personal bank account.

Id. at *1 (footnote omitted).  Chicago Steel admitted to underreporting in the first category.  Id. at *2.  However, Chicago Steel refused to pay the amounts alleged to be due on checks.  Id.  Chicago Steel argued that summary judgment should be granted because the Funds had no evidence that the cash went to paying workers for covered work.  Id. at *3.  The Funds argued that the checks had specific notations that were consistent with the notations that Chicago Steel used in records regarding payrolling.  Id. at *4.  Further, the Funds argued that "because they had shown that Chicago Steel's business records 'are so riddled with inconsistencies' and of questionable accuracy, they have brought forward evidence of the employer's breach of its record-keeping duty under ERISA, 29 U.S.C. § 1059(a)(1), which in turn shifts the burden to the employer to prove that the hours reflected in the Funds' audit report is not covered under the collective bargaining agreement."  Id. at *5.  Despite this evidence, the Chicago Steel court held that the Funds could not meet their burden because there was no evidence that work paid with cash was actually performed.  Id.  The court pointed out that:

      the Funds have not identified any employee who did work covered
      under the collective bargaining agreement with Local No. 1 who was
      paid in cash for the audit period. For checks with suspicious

12

    notations, there is no evidence that the Funds attempted to link
    the dates of these checks to particular Chicago Steel employees or
    even particular projects covered under the collective bargaining
    agreement (nor is there any basis for a trier of fact to assume
    that all Chicago Steel work within the audit period was only on
    Local No. 1 projects).  Indeed, the Funds have not even referred
    to the sections of the collective bargaining agreement that
    address covered work.

Id. at *6.

Similarly, here, the Trust Funds have made no showing that these missing invoices are linked to any specific employee or any specific project.  Indeed, the Trust Funds have not presented any evidence that the "missing" invoices even exist.  Instead, the Trust Funds urge the Court to assume that unknown third party clients were billed for covered work performed by Nancie's Sweeping employees on the simple basis that Nancie's Sweeping has numerical invoices.  As such, the Court finds that the Trust Funds have not provided sufficient evidence that Nancie's Sweeping employees performed covered work that was billed through the "missing" invoices.

**IV.  Conclusion**

For the reasons outlined above, the Court finds Nancie's Sweeping liable to the Trust Funds in the amount of $283,681.95 minus the corrections that were pointed out in hearing.  The Trust Funds are ORDERED to submit a proposed final judgment with the corrected amount as well as ten (10%) in liquidated damages and prejudgment interest

calculated pursuant to 26 U.S.C. § 6621.  The Trust funds are further ORDERED to submit a supplemental motion regarding the appropriate amount of attorney's fees and audit costs given the Court's findings. The Court sets the following briefing schedule for the attorney's fees and costs motion:

> Motion filed:   September 14, 2009
> Opposition:     September 21, 2009
> Reply:          September 28, 2009
> Hearing:        October 5, 2009 at 1:30 p.m.

IT IS SO ORDERED.

DATED:  8/14/09

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

14